APPLICATION OF UPHAM and another, Trustees.
UPHAM and another, Trustees, Respondents, vs. PLANKIN-
TON and another, imp., Appellants.

*October 30, 1912—February 18, 1913.*

*Wills: Construction: Intent of testator: Trusts and trustees: Chang-
ing scheme or subject of trust: Conversion of realty into per-
sonalty: Legislative power: Leasing of realty by trustees: Du-
ration of leases: When may extend beyond the life of the trust:
Interests of persons not in esse: Power of court: Appeal: Af-
firmance of judgment.*

John Plankinton, by will, caused the title to a large amount
of valuable, leasable and leased real estate to be vested in
trustees for a long indefinite term with manifest intent that
such title should, ultimately, devolve upon or be conveyed to
specified beneficiaries.  Power to sell was, impliedly, withheld
from the trustees.  In respect to the title, vested, contingent,
actual, expectant, and possible interests were created, and per-
sons *in esse* as well as in possibility were made objects of the
testator's bounty.  The "entire control, management and
charge of the estate" was "committed" to the trustees to ad-
minister for the purpose of producing revenue without parting
with title during the trust.  They determined that replace-
ments of buildings and long leases extending beyond the pos-
sible existence of the trust were necessary, and proceedings to
that end were commenced under ch. 300, Laws of 1899, and an
action in equity as well.  Authority as prayed for was granted
in both upon the ground that it was for the best interests of
all the beneficiaries.  Strict regard was not had as to whether
power existed to do so under the will.

1. Every person of mature age and sound mind has an inherent
   right, conformable to reasonable regulations, to make his
   own will and have it carried out according to his intent.
2. It is judicial duty whenever properly invoked to discover, if
   practicable, the real intent expressed in a will and enforce it.
3. Testamentary intention is determinable, solely, from the will,
   read in the light of its characterizing circumstances, aided by
   written and unwritten rules for solving uncertainties.
4. Neither written nor unwritten rules, nor the discretion of bene-
   ficiaries or courts, can legitimately change a testamentary in-
   tention.
5. A valid trust in property created with intention expressed or
   necessarily implied, that it shall endure for a specified time
   and for specified objects, is due to be carried out according to
   such intent.
6. A trust created by will for designated persons cannot be changed
   by their trustee, or the court, to better promote the interests of

the beneficiaries,—the judgment of the settlor in respect to the matter is the law of the trust.

7. In every trust in property, unless accompanied by unmistakable prohibition, there is an implied purpose, that the subject may, to prevent destruction thereof and defeat of the trustor's purpose, be changed from one kind into another and the equivalent administered in place of its antecedent; but always to the end originally specified.

8. In executing the implied intent of a trustor, the court may act upon the interests of remaindermen, interests vested and contingent, and interests of persons *in esse* and those in possibility, so as to change the title absolute, transferring the interests of every nature from the original subject to its equivalent.

9. The legislature cannot, legitimately, abrogate the right to have a trust in property carried out according to the purpose of the settlor, and an enactment which, in its letter, might seem otherwise, is not to be construed as attempting to do so unless the contrary is unavoidable.

10. Ch. 300, Laws of 1899, purporting to authorize conversion of realty into personalty and administration of the equivalent, regardless of the character of the interests therein,—vested, contingent, actual, or possible,—does not apply to property held in trust with specified directions as to its administration and disposition.

11. If a trustee is given full control of real estate to produce revenue therefrom and is not empowered to sell the property, he may execute the trust by creating leasehold estates therein of any reasonable duration which the trustor might fairly have had in contemplation.

12. In the circumstances stated in No. 11, a trustee, with judicial advice, may create a leasehold estate extending beyond the termination of the trust.

13. Where the "entire control, management and charge" of realty is "committed" to a trustee, primarily, to administer it so as to produce by rentals the greatest practicable amount of net revenue, and the trust is to extend, in probability, over a long but uncertain term, the trustee may, by approval of the court having jurisdiction of the matter, execute the trust by creating leases to continue beyond the life of the trust, even to a term of ninety-nine years if such term is reasonable under all the circumstances as the trustor might probably have regarded the matter when he created the trust.

14. The power to lease as indicated in No. 13 is not one to vary or violate the trust but one to execute it; therefore when it is

negatived in the language of the trust, either expressly or by
necessary implication, it does not exist by intention of the
trustor and cannot be supplied by the discretion of the trustee
whether with or without judicial aid.

15. In all matters, out of the ordinary, of administering a trust
which call for or render advisable judicial aid, the court must
place itself, as near as may be, in the place of the creator of
the trust at the time of its origin and speak by his implied di-
rection.

16. The creation of a leasehold estate for any term, consistent with
approved methods of handling similar property under similar
conditions, is not equivalent to a transfer of the title and does
not violate an express or implied prohibition in that regard.

17. If a judgment be right on the evidence and the facts found it
will be affirmed regardless of whether the reason assigned for
it by the trial court is sound.

  [Syllabus by MARSHALL, J.]

  TIMLIN, J., dissents in part.

  BARNES and VINJE, JJ., dissent.

APPEALS from an order and a judgment of the circuit
court for Milwaukee county: W. J. TURNER, Circuit Judge.
*Reversed as to the order and affirmed as to the judgment.*

The order was in a special proceeding commenced under
ch. 300, Laws of 1899, as amended by ch. 342, Laws of 1899,
for authority to make a ninety-nine year lease of interests
created in certain real estate by the will of John Plankinton,
deceased, the legal title being vested in testamentary trustees
and there being beneficiaries *in esse* and others in possibility.

The petition was made by the trustees. It was granted.
The statute, in terms, authorized judicial permission, for any
of the reasons specified in sec. 3503 of the Statutes, to sell,
mortgage, lease, or otherwise dispose of any real estate or in-
terest therein owned or possessed by any person whether in
being or not, known or unknown, under and by virtue of any
deed or other instrument or any last will and testament, the
proceeds, less the costs of proceedings, to have the cast of real
estate and take the same direction as the property equivalent
would have taken had the sale not been made, and be invested

or disposed of under the direction of the circuit judge for the benefit of the person, or persons, who may be or may become interested in the subject of the sale under the various sources of title,—deed, will, or other instrument,—such proceeds and the income thereof to be at all times under the direction of the court.

The proceeding was in conformity to the statutes. The ground for the assistance asked for and granted was that the petitioner believed "it would be for the best interests not only of those persons having present interests in said real estate, but also of all persons now living or yet unborn who have or may have any contingent interest in such real estate, or any part thereof." The will of Mr. Plankinton took effect March 29, 1891. He died at his residence in Milwaukee, Wisconsin. In respect to the real estate affected the court found:

(1) The Plankinton House property is of the approximate value of $2,600,000, without counting the buildings which, under the circumstances, are of no value. The land fronts 420 feet on Grand avenue in the city of Milwaukee and extends back 200 feet. It is covered by a building used, in the main, for hotel business. It will require $3,000,000 to adequately improve the property. It is extremely difficult to secure a tenant to undertake that. The hotel is being conducted for the benefit of the estate. The income of the Plankinton House property, otherwise, would be less than $20,000. The value of the land has greatly increased since the testator's time, resulting in fifty per cent. increase in taxes. The buildings are unfit for modern conditions and will not warrant the expense of putting them into good repair and keeping them so. Had they been in good condition for 1911, the net income would have been less than $75,000, subject to deductions for part of the $42,500 of annual interest on the mortgage which covers such and other property. Because of danger from fire, limit reached of income from portions not used as a hotel, peril of a competing hotel in the

vicinity being established, and incapacity of the estate to replace the structures, something of a radical nature is essential to preserve the value of the property and make it efficient as an income producer. All parties presently, or contingently, directly or indirectly, interested would be benefited by leasing the same for ninety-nine years on such terms as would insure realization of the testator's purpose to perpetuate the hotel business and promote the welfare of such parties.

(2) The Boston Store property is at the southeast corner of Fourth street and Grand avenue, and is 200 feet on the first and 160 feet on the second street. The building is under lease to a corporation for department store purposes. It is more suitable for manufacturing purposes. It does not constitute a suitable improvement of the land which is best adaptable for retail mercantile business. It is worth around $800,000. The improvements are about $200,000. The lease runs to 1922 with an option for the lessee to continue and provision for revaluation of the property and readjustment of the rent. The trustees are without funds to make proper improvements. The owners of the corporate stock of the lessee are competent to handle and adequately improve the property and will do so if given a ninety-nine year lease thereof. The income has rapidly increased under the development produced by the proposed lessee. The proposed lease, if made, would conserve the interests of all present or contingent owners.

(3) The triangle property is forty-two feet on Wells street, sixty-five feet on Second street, and seventy-six feet on West Water street, in the city of Milwaukee, Wisconsin. The stated reasons for leasing, in the main, are the same as those mentioned respecting the Boston Store property.

The court found, generally, that a leasing of the three parcels of land would substantially promote the pecuniary interest of all, present, contingent, probable, and possible, bene-

ficiaries under the will, and that such interests are as follows: The trust will cease upon the death of *Elizabeth A. Plankinton,* who is unmarried and more than fifty-five years old. The whole title will then vest in *William Woods Plankinton,* aged about thirty years, if he survive. In the meantime, *William* and *Elizabeth* are equally entitled to the net income. The interest vested in *William,* in case of his not surviving *Elizabeth,* will go to his children *William Woods Plankinton, Jr.,* and *Elizabeth Stuart Plankinton,* if they survive, otherwise to the institutions named as defendants, with possibilities, however, of the class composed of such children opening to let in future-born brothers or sisters. The legal title, presently, is lodged in the trustees subject to pass on as indicated. Their powers are thus specified:

"It is my will that during the term of their trust, said trustees have the entire control, management and charge of the estate and property committed to them, both personal and real, collecting, receiving and handling all moneys for the interest of the estate, continuing or changing any and all investments which may have been made as they shall deem best, investing and reinvesting or otherwise using any and all moneys that may come into their hands in such manner and upon such securities as they shall deem best, intending thereby to give them full authority and discretion, and not holding them to any prescribed rules governing an investment of trust funds.

"It is my will that during the term of their trust said trustees out of the income derived from my estate in their hands, care for, maintain and keep in good repair and condition all buildings and other property as shall be for the best interest of the estate, and that by repairing and replenishing when necessary, they maintain and keep up the furniture and all articles and property of any kind whatsoever in the hotel building in the city of Milwaukee known as the Plankinton House, which I shall have provided for use or convenience or adornment so that so long as the building shall remain used and kept as a hotel, it may be, in all respects, first class.

"It is my will that said trustees shall set apart each year

one tenth of the whole net income of my estate and hold the same and all additions thereto as a fund to meet any extraordinary expenditure, or any expenditures for which the income is not sufficient, which they shall deem best for the protection or benefit of the estate.

·  ·  ·  ·  ·  ·  ·  ·  ·  ·  ·  ·  ·  ·

"The trustees are hereby authorized, and the survivor of them is authorized, to sell and convey any and all real estate hereby devised to them which shall be vacant and not occupied with buildings at the time of my death, on such terms and for such prices as they shall deem best, and to invest any or all moneys received from such sales in the purchase of improved real estate or in erecting buildings on any vacant land held by them as part of my estate, as they shall deem best.

"In case of the damage or destruction by fire or other casualty of any building held by the trustees for which they shall receive insurance moneys, it is my will that the trustees apply such moneys, or so much as may be needed, to the repair or rebuilding of such building, with full authority to make any changes or improvements in so repairing a damaged building again on a site of a destroyed building as the trustees shall deem advisable, and if at any time they shall deem it best, they are authorized to use the ten per cent. reserved fund for such purpose, in addition to insurance moneys received."

The court decided that it had jurisdiction to grant the petition and did so, and ordered the referee, appointed to represent the minors and possible future unborn possessors, to join, as such, with the trustees and *William Woods Plankinton* in making the leases.

As a companion proceeding, the trustees, by action, invoked the general equity power of the court for instructions and permission respecting the same matter. *William Woods Plankinton,* his wife, sister, and two minor children were made defendants. The minors answered by guardian *ad litem,* as they did in the special proceeding, substantially challenging the right to do the things proposed. The hearing in the action was had at the same time as that in the special pro-

ceeding. The evidence was the same in both and so were the findings.

As conclusions of law the court specifically passed on its jurisdiction in favor of the plaintiffs, both as to present beneficiaries and contingent beneficiaries *in esse* and those not so, and held that—within the duty of the trustees to protect the property so as to effect the purposes of the trust, preserve the Plankinton House property from waste, and promote the best interests of the beneficiaries in being and those unborn,— they possessed power, under the direction of the court, and that it was their duty, to make the ninety-nine year lease proposed. The same conclusion was reached as to the other two pieces of property. Judgment was entered accordingly. The infant defendants, by their guardian *ad litem,* separately appealed in the special proceeding as well as in the equity action. The questions raised in the two appeals are identical.

For the appellants there was a brief by *Fred C. Ellis,* guardian *ad litem,* and *Lines, Spooner, Ellis & Quarles,* attorneys for the guardian *ad litem,* and oral argument by *Mr. Ellis.*

For the trustees, respondents, there was a brief by *Cary, Upham & Black* and *Miller, Mack & Fairchild;* for the *Herzfeld-Phillipson Company,* one of the lessees appearing as a respondent, there was a brief by *Flanders, Bottum, Fawsett & Bottum,* counsel; and the cause was argued orally by *Geo. P. Miller, James B. Blake,* and *Charles F. Fawsett.*

Marshall, J. Some principles which have been plainly and safely, it is thought, intrenched as a part of our unwritten law, may well be stated at the outset in writing this opinion. No discussion of them is deemed to be necessary. They have passed through that stage and become fixed in place as part of our system of unwritten rules which may be, confidently, turned to, under the guardianship of the fundamental law, to protect the inherent right of the living, reach-

ing beyond the termination of visible existence of the inheritor, to conserve the rights, whether vested or contingent, of those *in esse* and those existing only in possibility, as well.

The suggested statement of principles is not necessary because of any controversy between counsel for the respective parties as to their existence, or between counsel and the court, but because of the convenience it will afford in testing the questions to be solved and the dignity it may lend to this important case in pointing the way to right results in future similar controversies.

Every person of mature years and sound mind has a right to make his own will, conformable to statutory regulations designed to safeguard that right and not violating any written or any unwritten law, and to have that will carried out according to his intent. *Will of Rice,* 150 Wis. 401, 136 N. W. 956, 137 N. W. 778.

It is competent for the courts, and it is their duty, whenever invoked in the matter, to enforce the validly expressed intent of a testator and to discover such intent where there is obscurity. Neither courts nor beneficiaries nor legislatures are competent to violate such intent and substitute their discretion for that of the testator. *Will of Rice, supra; Bussell v. Wright,* 133 Wis. 445, 450, 113 N. W. 644.

The testamentary intention in any case is to be determined from the will, read in the light of the circumstances characterizing its making, and aided by established unwritten and written rules for construction, in case of obscurity. Such rules can only legitimately aid when aid is necessary to understand the purpose intended to be embodied in the language used and, so, take hold only where uncertainty commences and let go where it ends. They cannot control or vary the intent or properly prevent its execution. *In re Moran's Will,* 118 Wis. 177, 96 N. W. 367; *Lichter v. Thiers,* 139 Wis. 481, 486, 121 N. W. 153; *Perkinson v. Clarke,* 135 Wis. 584, 116 N. W. 229.

If a person creates a valid trust in property by will or

otherwise, and, expressly, or by necessary implication, provides that his creation shall not be changed by beneficiaries, trustees, or otherwise, it must be carried out according to the purpose of the creator. *Holmes v. Walter,* 118 Wis. 409, 95 N. W. 380; *Patton v. Patrick,* 123 Wis. 218, 101 N. W. 408; *Will of Dardis,* 135 Wis. 457, 115 N. W. 332; *Will of Rice,* 150 Wis. 401, 136 N. W. 956, 137 N. W. 778.

In respect to the dignity of a trust created by will, the supreme test is, What did the testator intend? That being discovered it is the law of that trust. Courts have no power to frustrate it and substitute a different scheme,—there can be no substitute method. *Bussell v. Wright,* 133 Wis. 445, 113 N. W. 644.

"The rights of an owner of property to control its use and management during his life and after his death, within certain limitations imposed by law, are among the most sacred, and entitled to the most careful protection at the hands of courts, without scrutiny as to the quality of his reasons in making such choice. Among these rights is that of preserving specific real estate as such within a limited time after his death. He may think that thereby is assured either a more certain or a larger income than could be obtained by its sale and the investment of the proceeds, or he may believe that the increase in sale value during that term will be for the best interest of those for whom he desires to provide." His will so long as he violates no law, is supreme. *Patton v. Patrick,* 123 Wis. 218, 221, 101 N. W. 408.

A presumed intention is, in general, embraced in the language of a trust prohibiting the trustee from destroying, or permitting destruction, of the subject of the trust. This does not mean mere diminution of profitableness nor, necessarily, annihilation of physical things, but destruction of the trust scheme, in the general sense, a happening preventing the subject of the trust from reaching the intended beneficiaries and in the way intended. *Ruggles v. Tyson,* 104 Wis. 500, 509, 81 N. W. 367.

For the purpose of effectuating the presumed intention of the creator of a trust that the subject thereof shall not be allowed to be lost, equity power may pass upon a situation of peril in that regard, and, if the necessities thereof clearly require it, read out of the trust the purpose aforesaid, and by an advisory judgment, authorize trust property of one kind to be converted into another to be administered as an equivalent and take the same course as to distribution and enjoyment. *Ruggles v. Tyson, supra; Bloor v. Smith,* 112 Wis. 340, 347, 87 N. W. 870; *In re Kingston's Estate,* 130 Wis. 560, 564, 110 N. W. 417.

In the circumstances stated in the last foregoing, equity may bar remaindermen *in esse* and possibility, those holding vested and those holding contingent interests, all, so as to change the title, absolutely, to the entirety, if that be, and only so far as that may, clearly, appear to be, necessary, but cannot extinguish the rights of person in the equivalent—the subject of the trust in its new form—to possess it presently or contingently, actually or possibly, or enjoy the income of it in the time and in manner and proportion, intended as to the original subject. *Ruggles v. Tyson, supra* (p. 516); *In re Luscombe's Will,* 109 Wis. 186, 85 N. W. 341; *In re Kingston's Estate, supra; Steele v. Korn,* 137 Wis. 51, 57, 118 N. W. 207, 120 N. W. 261; *Will of Rice,* 150 Wis. 401, 436, 136 N. W. 956, 137 N. W. 778.

Guarded by the foregoing there seems to be very little, if any, difficulty in disposing of the order appealed from. Ch. 300 and ch. 342, Laws of 1899, upon which the special proceeding was grounded, provide, generally, for the administration of property interests in real estate in cases falling under either subd. 1 or 2 of sec. 3503 of the Statutes. It embodies a complete scheme which, if applicable to such a case as this, would in whole or in part, supersede the scheme of the settlor. No one could create a trust by deed or will with any certainty that his creation would have any enduring

vitality. It would be subject to displacement by the judgment of any court having jurisdiction of such matters, and to substitution of some other scheme more suitable to new conditions and the needs or wishes of beneficiaries, in the discretion of the chancellor. It is not likely that the legislature intended any such thing. It would be violative, as we have seen, of fundamental rights. It would be so contrary to the judicially declared law and so subversive of control which it is commonly thought one has, and ought to have, over his property, that the legislation should not be read even as an attempt to authorize supersession of control over trust property,—placed by a settlor with a person of his own selection, to be administered in a way of his own,—by a trustee appointed in some other way and to administer the subject in some other manner. An entire trust estate might be thus split up by the creation of many statutory trusts, and the testamentary trust, or trust by deed, be wholly or partly extinguished, and, in case of a very large estate, most distressing and harmful confusion created.

It is considered that the statute to which the special proceeding is referable, was designed to deal with real-estate interests in the absence, not in violation, of an existing scheme under a valid trust. In any event, it cannot be regarded as affording authority for disturbing the trust created by Mr. Plankinton's will. Therefore, the order appealed from must be reversed, and the matter remanded for a dismissal with costs.

If reconcilement of the reasons found in the conclusions of law upon which the judgment appealed from is based, with the foregoing stated principles, was vital, very serious if not insurmountable difficulties to its approval would stand in the way. The trial court seems to have been guided, as in making the order closing the special proceeding, by the idea that unrestrained authority exists for judicial exercise of judgment respecting what is for the best interests of the benefici-

aries under Mr. Plankinton's will, and that the trustees, with judicial advice and approval, may freely exercise their judgment as to what will best promote such interests, instead of both judicial duty, and duty of the trustees as well, being confined to execution of the judgment of Mr. Plankinton as regards what he believed would best promote the welfare of the recipients of his bounty. The conclusions of law seem to go upon the theory that the scheme of the statute,—to which we have referred and found does not apply at all,—or the scheme of the trustees approved by the court may prevail over that of Mr. Plankinton merely to promote, as may be presently thought, the best interests of the beneficiaries. So we must look to the will, in the express and implied powers conferred, extending to the power implied in equity as well as that implied from the language used, and, in view of all the circumstances, discover what authority the trustees and the court have over the subject of the trust,—not to any statute or to the general judicial power to supervise the administration of trusts. Mr. Plankinton did not leave his property to be handled at the will of any trustee or court. He was not a man to do such a thing, as plainly appears from the record. He was a great business man, and, evidently, would not intentionally have consented to any disposition of his property or administration thereof other than according to his own scheme. So we must tie to that,—to what he thought would be for the best interests of the objects of his bounty,—not act upon what may, within the meaning of the statutes, appear to the court, merely to best promote such interests.

Whether a case was made by the facts found for a change in the letter of Mr. Plankinton's scheme, keeping within the implied authority to conserve the subject of the trust from destruction, is by no means clear. The rule on the subject is a very important one, but the overshadowing necessity requisite to give it activity and the limitations of it to necessities, and the essential that, in case of a change, it shall be

into an equivalent without changing the real beneficial character of the final destiny of the subject of the trust, must be kept significantly in view. Without the rule itself, the law would not afford capability of dealing with many situations liable to arise. Failure to keep in mind its logical basis and precise limitations, would result in the mischief of extending its application till, in time, the inviolability of trusts would be destroyed and no person could create one with any certainty of its duration according to his wishes.

We do not understand from the briefs of counsel for respondents, that they seek, in the main, to support the judgment on the doctrine of *Ruggles v. Tyson,* 104 Wis. 500, 81 N. W. 367, but rather confess that, if authority to make the proposed leases cannot be read out of the will and, especially, if such power is negatived thereby, it is very doubtful, at least, whether the judgment can be sustained. They plant the case confidently upon the proposition that the will does not negative exercise of such power; and, by reasonable implication, confers it as a feature of ordinary administration,— not merely one to prevent destruction under the rule of *Ruggles v. Tyson, supra.* So,—appreciating the difficulties of squaring the case, on the facts, with such rule in view of the importance of guarding it against extension to accommodate the desires of parties, and without deciding whether such difficulties are insuperable, as counsel for appellants contend,— we pass to the main question urged by counsel for respondents.

If the will itself authorizes the exercise of authority as directed by the judgment, and as ordinary matter of administration, limited, if at all, by the exercise of sound judgment and judicial approval, no resort to the extraordinary authority which would be implied *ex necessitate,* in circumstances satisfying the rule on that subject, is needed.

There are these significant features of the will: The trustor conferred upon his trustees almost unlimited power of ad-

ministration. They were given, during the term of the trust, "entire control, management, and charge of the estate." They were authorized to "maintain" as well as "keep in good repair and condition all buildings," etc. The term "replenish" is used as synonymous with "maintain." The accumulation of a large fund was contemplated to provide for "extraordinary expenditures . . . which they shall deem best for the protection of the estate." While a desire is plainly expressed for the hotel, as left by the testator, to be maintained, the will as plainly contemplates a possible destruction of it, or necessity of replacement. The special fund provided for, doubtless, had possibilities in his mind equal, with salvage by way of insurance or otherwise, to the requirement for a new building and the trustees were authorized to expend such fund, in their discretion, "for the protection or benefit of the estate." The real estate evidently was depended upon by the testator to yield a large revenue in rentals, and it was "committed" to the trustees to make the yield as large as wise management could accomplish. "During the term of their trust" the entire control "was committed to" them. Nothing was said about how such control should be exercised as regards leasing, or any other way for deriving income. All, under the broad power of "control," was "committed" to the trustees. But income, and income only, as to the improved property as such was thought of, while conversion of realty into personalty as to unimproved realty was contemplated and broad powers were expressly conferred in respect thereto.

From the foregoing it seems clear that Mr. Plankinton, as regards leasing improved real estate, intended to clothe the trustees with all power which he possessed and which he might, if living, probably exercise in case of conditions making it advisable from a business standpoint. There was no restriction upon leasing. There was no express restriction upon power to sell, though there was such by implication.

"Entire control, management, and charge" is about as broad a power in trust as could be expressed. As regards leasing to obtain income such language does not appear to be limited by anything which followed, unless by the implied withholding of power to sell improved property,—implied withholding, from the grant, specially, to sell unimproved property and the thought running all through the instrument of having the improved property so administered as to produce income by selling the use of it.

In connection with the features of the will to which we have referred, the circumstances and conditions which characterized the making of it must be considered. That the instrument is ambiguous to some extent needs but to be suggested. The whole history of this litigation evidences it. So we may properly read the instrument from the viewpoint of the testator at the time he made it.

The following circumstances are significant: The particular real estate is of a kind, as indicated from the evidence, and was when the will was made, which can most profitably be handled by long leases,—the longer probably the better. To tie such property up under leases of short and uncertain duration, which would be the case if the power of control gave no right to lease otherwise than during the existence of the trust, would be very detrimental to the income-producing character of it; while long leases with revaluations and readjustments at reasonable periods, would greatly promote income. We may well assume that Mr. Plankinton appreciated that, when he made the will, and further appreciated that, as time continued, the property would become more and more appropriate for long leaseholds, and in that state of mind used the broad language of the power of "control" to place his trustees, as near as practicable, in possession of all the authority he had, save that of parting with the title.

So from the will itself and from it, in connection with the

circumstances characterizing its origin, we are constrained to hold that the power to lease, within any reasonable limitations, which, under all the circumstances, may well be said to include leasing for ninety-nine years, so common in large cities, was given by Mr. Plankinton to his trustees, unless a lease for such a long term, as matter of law or custom, was understood, at the time the will was made, to be within an express or implied prohibition to part with title, or unless such unqualified power as was conferred in this case "during the term of the trust" by necessary implication or by settled law, conferred no power to create a leasehold term extending beyond the termination of the trust.

The general doctrine, applicable to the matter under discussion, is that an express power to lease given to a trustee, confers authority to make a lease for any reasonable period, considering the kind of property and the custom of the country and all the circumstances bearing on the subject. An implied power to lease growing out of the creation of a trust in real estate without power of sale, but in contemplation of its being administered to produce income, confers the same power to lease as in the first situation. "Entire control, management, and charge" conferred on trustees, as in this case, affords discretionary power to lease within such reasonable boundaries as the trustor would have done.

There are many phases of the matter treated in the authorities the general trend of which is as stated. The power to lease is not restricted to the creation of leaseholds, terminable with the trust power, unless so restricted, expressly or by necessary implication, from the language of the trust. 2 Perry, Trusts (4th ed.) §§ 484, 528, 608; 2 Beach, Trusts, § 446; Lewin, Trusts (11th ed.) pp. 632, 633; Underhill, Trusts (Am. ed.) 347, 349, note 2; Beckett, Trusts, § 570; *Ricardi v. Gaboury,* 115 Tenn. 484, 89 S. W. 98; *Denegre v. Walker,* 114 Ill. App. 234; *Hale v. Hale,* 146 Ill. 227,

253, 33 N. E. 858; *Marsh v. Reed,* 184 Ill. 263, 271, 56 N. E. 306; *Denegre v. Walker,* 214 Ill. 113; 73 N. E. 409; *In re Hubbell Trust,* 135 Iowa, 637, 113 N. W. 512.

An examination of the cited authorities leaves no sound basis to doubt that, on principle and precedent, under a trust as broad as the one created by Mr. Plankinton and in such circumstances as characterized his creation, the trustees, by permission of the court, may make long leases as contemplated here.    They cannot be made in violation of the trust but can be made in the reasonable execution of it.    It being found that power exists, in execution of the settlor's purpose, to lease for a term beyond the period of the trust, the question of reasonableness of the lease is an administrative, and when presented to the court a judicial, question, and mainly one of fact,—one of such nature that, once determined by the trial court, a very clear case of want of judgment,—one amounting to an abuse of discretion,—would be required to render it liable to be disturbed on appeal.

It is unfortunate that writers on this subject do not always keep clearly in mind the distinction between reasonable acts in execution of a trust,—the effectuation of the settlor's purpose, and invasion thereof; and the distinction between leasing, even for a long term, and a disturbance of the regular course under a trust by conveyance of the title itself. Cases will be found so extreme that the result reached was justified under the doctrine of *Ruggles v. Tyson,* 104 Wis. 500, 81 N. W. 367, yet the court reasoned as if there was a rule authorizing the breaking in, or changing, or even abrogation of a trust in circumstances somewhat such as we have here and, particularly, such as we would have if such dire necessity were shown as to call for application of the valuable doctrine that equity may step in to preserve the subject of the trust and carry out the purpose of the creator by changing the form of such subject and administering the equivalent thereof.    In such circumstances there is no breaking in

on the trust,—no abrogation or violation of it,—but merely preservation of its vitality and prevention, to all intents and purposes, of impairment of its integrity.

The creator of a trust which is to last for a long term of years cannot be expected to anticipate and provide for all contingencies which may arise. Therefore he must create with special reference to such assistance as the law of the land, existing at the time of his death, may afford in case of a change of conditions requiring some special conservation of his subject. Such conservation may take place by administration, quite out of the ordinary,—even to the extent, *in extremis*, as in *Ruggles v. Tyson*, of changing of realty into its equivalent in personalty for administration in the new form, and power in that regard from the settlor be judicially seen to be more or less,—according to the nature of the subject, the object and the peculiar circumstances characterizing the origin of the trust,—plainly and comprehensively expressed in the language or general scope of the creation.

So, in matter of administration, out of the ordinary, as in this case, the court must stand in place of the creator of the trust, as near as may be, and speak by his implied direction under the new conditions. Where there is no requirement to change realty into personalty, as there was in the *Ruggles Case*,—dire necessity for such conversion,—in order to preserve from destruction, but the use of the property in substantially the way the settlor intended, is purposed, as here, the case is quite simple.

The point made that a leasing of the property as proposed is, to all intents and purposes, a sale,—a practical conveyance of the fee in violation of the trust—which at first impression seemed quite plausible,—has been met time and again and logically rejected by courts, as an examination of the authorities cited will show. Leases up to ninety-nine years are so ancient and so common as regards property of the kind in question, under such circumstances as characterized the

case in hand, as to cease to be thought of as particularly un-
usual.    In fact, they are regarded to be within the reason-
able contemplation of a person in such environment as
Mr. Plankinton was when he made his will.    In *Denegre v.
Walker,* 214 Ill. 113, 73 N. E. 409, a lease for ninety-nine
years was held legitimate, but a decree authorizing a lease
for ninety-nine years or more, was condemned as empowering
the trustee to lease for a thousand years, if he saw fit, thereby
virtually to convey the fee.    The authority was modified, ac-
cordingly, and sustained.

Before closing it should be said that *In re Hubbell Trust,*
135 Iowa, 637, 113 N. W. 512, upon which counsel for ap-
pellants rely, is in harmony with the foregoing.    It fully
recognizes what has been said and is to the effect that a trustee
cannot as a matter of course create a leasehold interest in real
estate held by him, as in this case, to subsist beyond the trust
period, but that there is an exception, covering situations
where effectuation of the purpose of the trust reasonably re-
quires the long lease.    Then the power to do so, unless ex-
pressly or by necessary implication negatived, is presumed to
be conferred by the trust.    The exercise of it to carry out
the purposes of the trust, is as legitimate as the exercise of
any power expressly conferred.

Thus it is considered that the judgment appealed from is
right on the facts found, though not upon the precise logic of
the conclusions on which the trial court based it.    Being
right, it matters very little whether the particular reasons as-
signed for it below are tenable.    It is in harmony with the
right to make a will and have it carried out according to the
testamentary intent embodied therein.    The particular in-
tent is gathered from the will, upon principle, and with the
aid of legitimate instrumentalities for discovering it.    The
disability to change a trust scheme from the one designed by
the trustor, is vindicated along with competency of the
trustee to do everything reasonable which is not prohibited

and is approved by the court, to effect the purpose of the trust, as is also, to that end, the power, by necessary implication embodied in the trust, to change the identity of the subject thereof into an equivalent, in dire necessity to save from destruction, though activity of the extreme power is not found necessary in this case,—only the ordinary power of administration to be exercised under the advice of the court in doubtful cases, as is contemplated in every trust creation by necessary implication where not negatived expressly or otherwise.

*By the Court.*—Ordered, that the order in the special proceeding be, and the same is hereby, reversed, and the cause remanded for dismissal with costs; and that the judgment in the equity action be affirmed. Costs to go to the appellants as to the order and respondents as to the judgment.

TIMLIN, J. *Horace A. J. Upham* and *George P. Miller,* testamentary trustees under the will of John Plankinton, deceased, succeeding those nominated in the will, brought in the circuit court for Milwaukee county a special proceeding under sec. 3503, Stats. (1898), and ch. 300, Laws of 1899, and amendments to the latter, now secs. 3519c *et seq.,* Stats., to obtain leave to lease for ninety-nine years, upon terms and conditions set forth in the proposed lease, three several parcels of down-town business property, part of the trust estate and situate in the city of Milwaukee. The only persons besides the said trustees interested are *Elizabeth E. Plankinton,* a maiden lady aged about fifty-seven years and daughter of the testator; *William Woods Plankinton,* of full age and married and the only surviving grandchild of the testator; *Alexandra Stuart Plankinton,* wife of the latter; *William Woods Plankinton, Jr.,* and *Elizabeth Stuart Plankinton,* infant children of *William Woods Plankinton* and his said wife; the possible unborn children of *William Woods Plankinton* or *Elizabeth E. Plankinton;* and a corporation known

as the *Passavant Hospital. Elizabeth E. Plankinton* and *William Woods Plankinton* and the wife of the latter join in the application to the court, and the infants are represented by Mr. Fred C. Ellis, their guardian *ad litem,* and these infants stand for and represent the contingent future interests of the unborn children of *William Woods Plankinton* or *Elizabeth E. Plankinton.* The trustees also brought in the same court a suit in equity seeking directions in the execution of the trust and asking power to make the said leases, in which suit all persons interested as above stated were also parties and in which *Elizabeth E. Plankinton* and *William Woods Plankinton* and wife joined in the prayer of the bill. The infant children of the latter couple appeared by the same guardian *ad litem,* and this suit presents the same questions presented in the statutory special proceeding first referred to, and was taken up and disposed of in the circuit court upon the same evidence and with the special proceeding. The *Passavant Hospital* appears to have a remote contingent interest in the trust property, and it acquiesces in the disposition of this matter made by the court below. That court authorized the execution of the leases, and the guardian *ad litem* for the infants and those of the same class thereby represented appealed to this court. These leases, by reason of the amount of rent reserved, the expenses of carrying the property by the lessee on account of taxes, etc., and by the covenants of the leases, require extensive improvements to be made and maintained by the proposed lessees.

At the death of testator, March 29, 1891, there survived him his widow, who died on October 19, 1900, his daughter *Elizabeth E.,* still living, and his son William, who died May 15, 1905, and who was the father of *William Woods Plankinton.* The residuary provisions of the will which carried the property in question were as follows:

"All the rest, residue and remainder of my estate and of property of every kind and nature which I shall own or in

which I shall have any right, title, interest or claim, at the time of my death, I hereby give, devise and bequeath unto the above named executrix and executor of this will and to the survivor of them in trust for the uses and purposes hereinafter set forth for a term during the lives of my daughter *Elizabeth E. Plankinton,* and my son William Plankinton, and twenty-one years thereafter, if they shall both survive me, but in case either should not survive me, then for a term during the life of the one who survives me and of my wife, if she survives me, but in case my wife does not survive me and one only of my said children survives me, then for a term during the life of such surviving son or daughter, and in case neither of my said children survives me and my wife survives me, then for a term during her life.

"It is my will that during the term of their trust, said trustees have the entire control, management and charge of the estate and property committed to them, both personal and real, collecting, receiving and handling all moneys for the interest of the estate, continuing or changing any and all investments which may have been made as they shall deem best, investing and reinvesting or otherwise using any and all moneys that may come into their hands in such manner and upon such securities as they shall deem best, intending thereby to give to them full authority and discretion and not holding them to any prescribed rules governing an investment of trust funds.

"It is my will that during the term of their trust said trustees out of the income derived from my estate in their hands, care for, maintain and keep in good repair and condition all buildings and other property as shall be for the best interest of the estate and that by repairing and replenishing when necessary, they maintain and keep up the furniture and all articles and property of any kind whatsoever in the hotel building in the city of Milwaukee known as the Plankinton House, which I shall have provided for use or convenience or adornment so that so long as the building shall remain used and kept as a hotel, it may be, in all respects, first class.

"It is my will that said trustees shall set apart each year, one tenth of the whole net income of my estate and hold the

same and all additions thereto as a fund to meet any extraordinary expenditure, or any expenditures for which the income is not sufficient, which they shall deem best for the protection or benefit of the estate.

"The moneys constituting such fund they shall invest and keep invested as they shall be able, so that the fund may be always available for the purpose intended, such investments to be made in such manner and on such securities as the trustees shall deem best.

"The trustees are hereby authorized and the survivor of them is authorized to sell and convey any and all real estate hereby devised to them which shall be vacant and not occupied with buildings at the time of my death on such terms and for such prices as they shall deem best and to invest any or all moneys received from such sales in the purchase of improved real estate or in erecting buildings on any vacant land held by them as part of my estate, as they shall deem best.

"In case of the damage or destruction by fire or other casualty of any building held by the trustees for which they shall receive insurance moneys, it is my will that the trustees apply such moneys or so much as may be needed to the repair or rebuilding of such building with full authority to make any changes or improvements in so repairing a damaged building again on the site of a destroyed building as the trustees shall deem advisable and if at any time they shall deem it best they are authorized to use the ten per cent. reserved fund for such purpose in addition to insurance moneys received.

"I hereby direct that said trustees pay to my wife, Annie B. Plankinton, out of the net income of my estate held by them, ten thousand dollars annually during her life, it being my intention thereby that she have means provided for the payment of taxes, repairs and other expenses upon the homestead with full authority to use any excess at her pleasure.

"I hereby direct that said trustees after paying or providing for the payment of all sums that shall be required each year for taxes, insurance, repairs and every other purpose required for maintaining and for the charge and care of my estate in their hands, as herein intended, and after setting apart the ten per cent. reserved fund each year and after paying or providing for the payment of the sum of ten thousand

dollars yearly to my wife during her life, shall divide the remainder of the net income equally between my wife, my son and my daughter, one third of such net income each year, to each, during their lives and these payments I wish to have made semi-annually.

"In case of the death of either of the three, leaving surviving no lawful issue, I direct that the share of such net income intended for such deceased one be thereafter paid to the other two, so long as they shall live (not exceeding the term of the estate of said trustees) one half to each, and upon the death of either of the two so surviving the third, leaving no lawful issue, I direct that the whole of such net income be paid to such last survivor during her or his life, not exceeding the term of the estate of said trustees.

"In case either dying shall leave issue surviving, then I direct said trustee to continue the payment of the share of such income hereby intended for such one deceased to the child or children of such deceased, share and share alike if there shall be more than one child so long as they shall live and so long as the estate shall be held by the trustees, and in case of the death of any child having lawful issue surviving, then to such issue during life, so long as the estate shall be held by said trustees, the issue in all cases taking by right of representation and not *per capita*.

"It is my will that the trust herein created shall cease and the term for which such trustees hold shall end upon the death of the one who shall survive last of my wife, my son and my daughter if such death of the last survivor shall occur before the expiration of the twenty-one years hereinabove stated for the life of the trust.

"All the rest, residue and remainder of my estate and of property of any kind that shall be and remain at the termination of the trust and the end of the term for which it is to be held by said trustees, under the preceding provisions of this will, I hereby give, devise and bequeath to the surviving issue of my son and of my daughter, if they shall leave issue surviving, one half to the issue of my son and one half to the issue of my daughter, such surviving issue taking in all cases according to the right of representation and not *per capita*, and in case either my son or daughter should die leaving no issue surviving him or her, then the entire rest, residue and

remainder aforesaid I hereby give, devise and bequeath to the issue surviving of either my son or my daughter who has left issue surviving, such issue in all cases where it is applicable taking according to the right of representation not *per capita*.    All real estate devised by this paragraph of my will is to be taken in fee and all personal property absolutely.

"In case there shall be no lawful issue surviving of either my son or my daughter at the termination of the trust herein and at the end of the term for which said trustees are to hold my said estate and property as above provided, and in case there has been no disposition of the property under any subsequent clause of this will, then upon such termination of the trust, I hereby give, devise and bequeath all the rest, residue and remainder of my estate and property held by said trustees unto the *Passavant Hospital* hereinbefore mentioned, meaning thereby the society, association or corporation having the charge and control of the hospital in Milwaukee known by that name, for the use and benefit of that hospital, all real estate devised hereby to be taken in fee and all personal property absolutely with full power to the devisees to convert, dispose of or use at pleasure for the benefit of the hospital."

Then follow contingencies upon which the trust term may be further shortened, none of which has occurred.

If this case presented the question of necessity for a departure from the scheme of the testator for the purpose of preserving the property or relieving the beneficiaries from want, one set of legal questions arise; but if there is no substantial departure from the general scheme of the will or conflict with the apparent plan of the testator and the only question is as to the length of the term and the conditions of the lease, that is to say, whether the lease is a reasonable exercise of the power of trustees and a reasonable disposition of the estate of infant wards, another and quite different legal question arises.    I do not think a ninety-nine year lease of property of this kind is equivalent or even analogous to a sale. A sale of real estate implies conversion into a different species of property, subject to different rules of descent, more portable and perishable, easily dissipated or sold, and requir-

ing for its continued enjoyment safe custody and collateral security, while real property leased for ninety-nine years follows the line of descent or gift, vested or contingent, marked out by the will, and presents the same or even greater features of stability and security as the land without such lease. From the nature of the property in question, viz. detached pieces of down-town business property in a large city and of great value, subject to extraordinary burdens and regulations and capable of earning a correspondingly large income, it must be apparent that the testator intended the trustees, in the management of this property, should lease it for a considerable term. Large mercantile or other business concerns whose business investments amount to many hundred thousands or several million dollars do not lease down-town property upon short-time lease, unless as a mere temporary makeshift. Great value must carry with it great burdens in the way of necessary buildings, improvements, taxes, assessments, and insurance. A suspension or cessation of income which would little affect property of smaller value may in a short time work the loss of the kind of property in question here. It was not expected that the beneficiaries of the trust at the termination thereof would occupy the property or use it for other than the use for which it is best adapted and that which will bring in the best and safest income. This property must be leased for a considerable number of years if it is applied to the use for which it is best adapted and in which it will produce the largest and most certain income. A lease by trustees of agricultural lands for ninety-nine years, were this not forbidden by our state constitution, would probably be unreasonable. *Att'y Gen. v. Owen,* 10 Ves. 555, 560. But even here the term "reasonable" renders a reference to the circumstances of each particular case indispensable. If it is a question of reasonableness, then the circumstances of each particular case must control. In case of such property, whether the lease will outrun the trust term is a matter of

little or no significance when the beneficiaries of the trust lawfully consent to the lease. Such beneficiaries rarely or never enter into manual possession of this kind of property and carry on a business or several businesses thereon. Such possession without carrying on an extensive business is impracticable. For the reason that the black sheep produce less wool than the white, and for other more personal reasons which will readily suggest themselves to the inquiring mind,. few of the *entrepreneurs* who carry on these large and risky enterprises are from that fortunate or unfortunate class of the people who come into the world as beneficiaries of a large trust estate. The objection to the length of the leasehold term is also based upon the fallacy that there will always be an advance in rentals. The truth is that there may be, in this respect, progress or regress. In the large city having room for expansion, location of business property with reference to existing currents of travel or traffic determines the rental value as a rule. The advantage may, with the efflux of time, pass from one street or quarter of the city to another, and when it does there will be a decrease in rental values on the street or in the quarter upon which or in which travel and traffic. Large and costly buildings erected and business es- value roughly corresponding to the increase of such travel and traffic have been reduced. There will be an increase of rental tablished by a tenant upon a ninety-nine year leasehold tend to check any diversion of travel and traffic from that locality and to keep up the rental value. The erection of such buildings and establishment of such business on any other street may, by diverting travel and traffic, materially decrease the rental value of the property to be leased, if it is situate on a street lacking such improvements. Under a ninety-nine year building lease, if diminution of rental value comes its ill effects fall upon the tenant owner of the building investment rather than upon the landlord, whose ground rental is by this building investment secured. Estimating the present and

# CORRECTION

Of lines 22-24 on page 302, 152 Wis.

traffic have been reduced. There will be an increase of rental value roughly corresponding to the increase of such travel and traffic. Large and costly buildings erected and business es-

prospective value, the chances for increase or diminution in value, the element of security and continuity of occupation as men do in transactions of barter, capable parties to the contract having adverse interests arrive at an agreement in ordinary cases of leases of this character. Where there are infants interested they may submit the proposed contract to a court for approval after hearing arguments and evidence for and against such contract. I see no reason upon principle to question the discretion of the court or deny its power to authorize a lease for this term. *Gomez v. Gomez,* 147 N. Y. 195, 41 N. E. 420.

By the will in question "the trustees are to have during the trust period the entire control, management, and charge of the estate . . . continuing or changing any and all investments which may have been made as they shall deem best . . . intending hereby to give to them full authority and discretion and not holding them to any prescribed rules governing an investment of trust funds." They are to derive income from the estate in their hands, and out of that income to care for, maintain, and keep in good repair and condition all buildings and other property as shall be for the best interest of the estate. So long as the Plankinton House shall remain used and kept as a hotel, it shall by repairs and replenishment of furniture, etc., be first class, but there is no requirement that it be maintained for any stated time as a hotel. There is no express power of sale of improved property. An implication forbidding such sale might be derived from the power of sale given to the trustees of unimproved property. The power of sale of the improved property from which income is to be derived is by this trust and by the statutes relating to trusts suspended during the trust term, but that is a mere consequence of secs. 2089 and 2091, Stats., and has no application to acts of the trustees not in contravention of the trust. I have no doubt that the trustees, with the consent and co-operation of the adult beneficiaries, were there no other benefici-

aries, could therefore enter into this lease, for such a lease in no wise tends to contravene the trust duties or to defeat the scheme of the testator. *Ricardi v. Gaboury,* 115 Tenn. 484, 89 S. W. 98; *Denegre v. Walker,* 214 Ill. 113, 120, 73 N. E. 409; *Marsh v. Reed,* 184 Ill. 263, 56 N. E. 306; *In re Hubbell Trust,* 135 Iowa, 637, 113 N. W. 512; *Norris v. Clymer,* 2 Pa. St. 277. As was said in the case last cited: "This is a change merely modal for the advancement of interests both private and public." If this is correct, I do not see how the fact that there are living infant beneficiaries to whom this real property must go at the termination of the trust estate in case they are then living, or in whom it is now vested subject to be divested by their prior death, and who are parties hereunto, can alter the situation. By sec. 3503, Stats., in force when this will was made, broad powers in this respect are conferred upon the circuit court, and the facts forming a basis for the exercise of such power were made to appear and are found by the circuit court. *Gomez v. Gomez,* 147 N. Y. 195, 41 N. E. 420.

Nor can it be successfully urged as an objection that there are or may be contingent future interests in the unborn children of *William Woods Plankinton* or *Elizabeth E. Plankinton.* These are all parties to this proceeding and this action, and represented, for the purposes of the proceeding and action, by the members of their class *in esse. Ruggles v. Tyson,* 104 Wis. 500, 506, 81 N. W. 367; *Kent v. Church of St. Michael,* 136 N. Y. 10, 32 N. E. 704, 18 L. R. A. 331; *Mead v. Mitchell,* 17 N. Y. 210; *Denegre v. Walker,* 214 Ill. 113, 120, 73 N. E. 409. At the time of the death of John Plankinton expectant estates were descendible, devisable, and alienable in the same manner as estates in possession, and they still are. Sec. 2059, Stats. When the owner of the expectant estate comes into being this statute at once empowers him. Before he comes into being his estate is subject to legislative action. Cases *infra.* Expectant estates are either estates commencing at a future day, denominated future estates, or reversions.

Sec. 2033.   All future estates are either vested or contingent—contingent whilst the person to whom or the event upon which they are limited to take effect remains uncertain. Sec. 2037.   Secs. 3519c to 3519l supplement sec. 3503, *supra,* and place future contingent interests of infants in real estate, so far as selling, leasing, or mortgaging the same is concerned, by order of the court, on a par with the vested interests referred to in sec. 3503 *et seq.*

Notwithstanding a suggestion to the contrary in *In re Kingston's Estate,* 130 Wis. 560, 110 N. W. 417, it has always been the law that the legislature could modify future contingent estates of those who come into existence after the passage of such legislation.   *Bass v. Roanoke N. & W. P. Co.* 111 N. C. 439, 16 S. E. 402, 19 L. R. A. 247 and cases in notes.   At the time of the separation of the American colonies from England, the law of that country and of this authorized the cutting off of future interests of unborn children in an estate tail by a proceeding called fine and recovery, which might be described in present-day terms as a land contract executed by the person in possession to a would-be purchaser in fee, a formal refusal by the seller to comply with it, and a judgment in favor of the vendee against him purporting to bind him and all unborn claimants.   A judgment requiring the execution of a deed to the real owner of land by persons having the record title to the whole estate, subject only to the contingency that other persons may be born who will have an interest in such record-title, is effectual to cut off the rights of such persons subsequently born. *Kent v. Church of St. Michael, supra.*   Under the real-estate law of this state as settled by the Wisconsin statutes above referred to, there can be no doubt, I think, of the application of these precedents to contingent future estates in this state. The power of the legislature in this behalf has been upheld under much more unfavorable conditions.   *Norris v. Clymer,* 2 Pa. St. 277; *Leggett v. Hunter,* 19 N. Y. 445; *In re*

*Field,* 62 Hun, 622, 17 N. Y. Supp. 19; *S. C.* 131 N. Y. 184, 30 N. E. 48; *In re Asch,* 75 App. Div. 486, 78 N. Y. Supp. 561; *Johnson v. Valentine,* 4 Sandf. 36; *Crutcher v. Rodman,* 118 Ky. 506, 81 S. W. 252.

But the court cannot take the property of one beneficiary and bestow it upon another. *Ruggles v. Tyson,* 104 Wis. 500, 81 N. W. 367; *Brevoort v. Grace,* 53 N. Y. 245; *Powers v. Bergen,* 6 N. Y. 358. I also understand *In re Kingston's Estate,* 130 Wis. 560, 110 N. W. 417, to say that a court of equity, prior to the enactment of ch. 300, Laws of 1899, possessed inherently, by reason of its general equity jurisdiction, the power conferred by sec. 1 of that act. I doubt the historical accuracy of this statement. *Rogers v. Dill,* 6 Hill (N. Y.) 415; *Baker v. Lorillard,* 4 N. Y. 257; *Faulkner v. Davis,* 18 Grat. 651; *Losey v. Stanley,* 147 N. Y. 560, 42 N. E. 8; 3 Pom. Eq. Jur. (3d ed.) § 1309; Stat. 11 Geo. IV and 1 Wm. IV, ch. 65 and statutes therein referred to, 17 Halsbury's Laws of England, p. 100; *In re Griffiths,* L. R. 29 Ch. Div. 248 (1885). The English statute, however, relates only to absolute or vested estates. *In re Horne's Settled Estate,* L. R. 39 Ch. Div. 84, 89 (1888). There are some cases to the contrary, and it is of little importance in the instant case, because the decision in *In re Kingston's Estate* does not go so far as to say that a statute could not authorize a sale or lease in such case where the sale or lease does not contravene the scheme of the testator. This court has acted in authorizing the sale of contingent interests, in the second application in *Ruggles v. Tyson,* 114 Wis. 301, 90 N. W. 113, when necessary for the preservation of the property for the beneficiaries or ultimate remaindermen. The order of the circuit court there affirmed authorized the trustee "to make conveyance, with the life tenant, of said lot 5, so as to convey the complete title thereto of all persons existent or hereafter to come into existence in or to said premises." Page 302. And I understand *Ruggles v. Tyson,* 104 Wis.

500, 81 N. W. 367, to hold the same rule.    So far as the instant case is concerned, there being nothing in the judgment of the circuit court conflicting with the general scheme of the testator, the property being applied to the uses for which it is best adapted and preserved for all who are or may become entitled to it under the terms of the will, each receiving the same kind and quality of estate as that devised to him, a mere question of reasonableness and expediency of the contract of leasing is presented.

I find no legal ground for dismissing the proceeding brought under ch. 300, Laws of 1899, and amendments, now secs. 3519c *et seq.,* Stats., and no reason satisfactory to me is given in the opinion of the court.    A proceeding of this kind under that statute was dismissed in *In re Kingston's Estate,* 130 Wis. 560, 110 N. W. 417, but upon the ground, as I understand it, that the relief there demanded would frustrate the object of the testator, and that the facts and circumstances wholly failed to show any necessity for such proceeding.    In *Lueft v. Lueft,* 129 Wis. 534, 109 N. W. 562, this court affirmed an order made in similar proceedings, where as in this case there was no conflict with the apparent intentions of the testator, saying: "Such a course is promotive, within the contemplation of ch. 300, Laws of 1899, of her interests in the property."    Upon fundamental principles there can be no doubt of the power of the legislature to authorize such a proceeding in a case like this.    I do not think sec. 3519k presents any obstacle, because that section authorizes the court to designate a trustee who will take charge of the proceeds for the person entitled thereunto.    The testamentary trustees should be so designated by the circuit court where there are such trustees, and in case of lease they continue to receive the rentals and hold and disburse them under the trusts created by the will.    In case of a sale the proceeds take like course.

*Will of Rice,* 150 Wis. 401, 136 N. W. 956, 137 N. W.

778, contains in the points actually decided nothing in conflict with this view. There, upon an appeal to the circuit court from an order of the county court admitting a will to probate, the circuit court had jurisdiction by such appeal only to affirm, reverse, or modify the order appealed from, with the right to determine such incidental and collateral matters cognate to such affirmance or reversal as might arise. Guardians *ad litem,* in consideration of large payments to them, joined with other parties in a stipulation extending the jurisdiction of the circuit court to hear and determine other matters destructive of the trusts. It was beyond the power of the guardians *ad litem* to make such stipulation, and the jurisdiction of the circuit court could not rest upon such invalid treaty or be upheld thereby. Consequently the whole matter was open to attack in this court, and under the law the trusts created by the will were upheld as against such stipulations and such invalid judgment of the circuit court based thereon. I think the learned circuit court in the instant case decided correctly, and its judgment should be affirmed.

BARNES, J. (*dissenting*). I am unable to find in the authorities cited in the opinion of the court any support for the proposition decided. I think authority and reason are against the decision.

The trust period ends with the death of *Elizabeth Plankinton.* When the lease was made her expectancy was about sixteen years. She may live a few years more or less, but the variance between the estimated and the actual length of life is not material, and for all practical purposes the estimate may be assumed to be correct. No express power was given by the Plankinton will to the trustees to lease the trust property at all, but such power could fairly be implied from the will. The trustees were expressly authorized to sell unimproved real estate. By implication they were prohibited from selling improved real estate. After the expiration of

the trust the will provided that the remainder in fee should vest in the testator's grandchildren, if any there were. It may be conceded that broad general powers were given to the trustees during the trust period.

The question involved is this: Where a remainder in fee is to vest in grandchildren after the trust terminates, and no express power is conferred to lease beyond the trust period, can the trustees make a valid lease for a period of eighty years, and perhaps eighty centuries, after the trust ends?

The court answers the question in the affirmative, and cites the following authorities in support of its conclusion: 2 Perry, Trusts (4th ed.) §§ 484, 528, 608; 2 Beach, Trusts, § 446; Lewin, Trusts (11th ed.) pp. 632, 633; Underhill, Trusts (Am. ed.) 347, 349, note 2; Beckett, Trusts, § 570; *Ricardi v. Gaboury,* 115 Tenn. 484, 89 S. W. 98; *Denegre v. Walker,* 114 Ill. App. 234; *Hale v. Hale,* 146 Ill. 227, 253, 33 N. E. 858; *Marsh v. Reed,* 184 Ill. 263, 271, 56 N. E. 306; *Denegre v. Walker,* 214 Ill. 113, 73 N. E. 409; *In re Hubbell Trust,* 135 Iowa, 637, 113 N. W. 512.

Sec. 484 of Perry on Trusts states that "trustees must make reasonable leases." Continuing it is said: "In one case a lease for ten years was allowed. Trustees have a general power of leasing, *if the lease does not exceed the quantity of estate that is in them,* and is a reasonable one."

In a note to this section, found in the sixth edition, it is said that "the weight of authority is to the effect that the lease is not binding upon the remaindermen after the termination of the trust."

Sec. 528 is to the effect that where trustees are charged with the payment of annuities, debts, legacies, or other sums out of the estate and there is no power of sale, they have an implied power to lease upon the ordinary terms or custom of the town in which the land is situated. The cases cited under this section do not involve leases extending materially beyond the duration of the trust, except the case of *Black v.*

*Ligon,* 2 Harper, Eq. (S. C.) 205. I also exclude *Newcomb v. Kettellas,* 19 Barb. 608, because it was not followed subsequently by the New York courts.

Sec. 608 reads as follows:

"There can be no doubt that it is the duty of the trustees or guardians of infants to lease the lands of their wards, as the wards are incapable of acting for themselves; and they must collect the rents and account for them; but they cannot execute leases extending beyond the majority of the infants; if they do, the infants, on coming of age, can disaffirm the lease and take the possession."

Sec. 446, Beach on Trusts and Trustees, recognizes the power of trustees to lease where they are given general control of the trust property. I quote from the text:

"It may be a question to what extent or for how long a time a lease may be given. In England a lease for a long period, as ninety-nine years, will not be sustained. In another case it was held that a lease might be made for a term of ten years. In a recent case it was held that where a will devises land to a trustee for the life of a third person, with power to sell, a lease executed by the trustee for a certain term, with an agreement to renew at the end of the term for another term, cannot be renewed by the lessee after the death of the person during whose life the trustee was to hold, as such an agreement in the lease does not bind the remainderman."

The foregoing is all there is to the section, aside from a reference to a Kentucky case which sustained a long-term lease on the well recognized ground of overruling necessity, which does not exist in the case we are presently considering.

The section cited from Lewin treats of perpetual charitable trusts which in no way involve the matter of leasing beyond the trust period.

The text referred to in Underhill is to the effect that a trustee who has the management of property "may grant a reasonable agricultural lease." The cases cited in note 2,

except in so far as they have been expressly or impliedly over-
ruled, deal with leases that did not extend materially beyond
the trust period.   In the note it is said: "As to whether a
trustee can give a lease to extend beyond the period of his
trust estate there is a singular dearth of authorities.   Yet on
principle it is clear that he cannot, except in the case of a
charitable trust."

Sec. 570 of Beckett on Trusts is simply a quotation from
secs. 528–531 of Perry on Trusts, and no other authority is
cited to support the text.   Mr. Perry's treatment of the sub-
ject has already been considered.

*Ricardi v. Gaboury,* 115 Tenn. 484, 89 S. W. 98, did not
involve a trust estate.   The question in that case was whether
the courts of Tennessee, under their common-law or statutory
powers, could authorize the leasing of a minor's property be-
yond the period of his minority.

With the exception of the Iowa case, which will be referred
to later, the remaining authorities cited are from the Illinois
court.   That court takes a position that is unique in refer-
ence to trust estates.   It held in *Marsh v. Reed,* 184 Ill. 263,
56 N. E. 306, that where a will strictly and definitely lim-
ited the term for which the trustee could lease trust property
the court could change the expressed intention of the testator
and enlarge that time, in the absence of overruling necessity,
if it appeared on the whole that the best interests of the par-
ties would be conserved thereby.

This doctrine was condemned in no uncertain or doubtful
language in *Ruggles v. Tyson,* 104 Wis. 500, 81 N. W. 367,
and in the still later case of *Will of Rice,* 150 Wis. 401, 136
N. W. 956, 137 N. W. 778.

On the authority of *Marsh v. Reed,* the court held in *Dene-
gre v. Walker,* 214 Ill. 113, 73 N. E. 409, that, acting under
the direction of a court of chancery, trustees might, with the
consent of the adult parties in interest, make a ninety-nine
year lease where the court was satisfied that it was clearly for

the best interests of the estate and the beneficiaries that such lease be made.

Unless the Illinois authorities form an exception, there was not a single case cited in the brief of respondents' counsel which supports the conclusion reached by the court. I do not think a single one of the authorities cited by the court, the Illinois cases included, sustain such a conclusion.

Cases holding a doctrine contrary to that now adopted by this court may be divided into two classes: (1) those holding that the term of the lease cannot exceed the duration of the trust, in the absence of express authority from the person creating the trust, and (2) those holding that leases may be made for usual and customary periods, but that the duration of the lease is approximately measured by the length of the trust period. Cases falling within the first class are *In re Armory Board,* 29 Misc. 174, 60 N. Y. Supp. 882; *In re Opening of 110th St.* 81 App. Div. 27, 81 N. Y. Supp. 32; *Griffen v. Ford,* 1 Bosw. 123; *Gomez v. Gomez,* 147 N. Y. 195, 41 N. E. 420; *Matter of McCaffrey,* 50 Hun, 371, 3 N. Y. Supp. 96; *Weir v. Barker,* 104 App. Div. 112, 93 N. Y. Supp. 732; *Bergengren v. Aldrich,* 139 Mass. 259, 29 N. E. 667; *Standard M. P. Co. v. Prince Mfg. Co.* 133 Pa. St. 474, 19 Atl. 411.

It is well said in *Matter of McCaffrey,* 50 Hun, 371, 374, 3 N. Y. Supp. 96, that "it would seem strange that one who holds an estate in trust for the life of another should have a power over the remainder, which would not have belonged to him if he had held the estate absolutely for life and not in trust."

Cases and authorities falling within the second class are *In re Hubbell Trust,* 135 Iowa, 637, 113 N. W. 512; *Greason v. Keteltas,* 17 N. Y. 491; *Hutcheson v. Hodnett,* 115 Ga. 990, 42 S. E. 422; 2 Kerr, Real Prop. sec. 1187; Jones, Landl. & T. § 91; 1 McAdam, Landl. & T. (4th ed.) § 70.

The lease we are considering does not fall within either

of the classes mentioned. It exceeds the trust period and is neither reasonable nor customary, and in my judgment is contrary to the will, which carried the fee to the remainder-men.

"The difference in value between a leasehold of ninety-nine years and a freehold is largely due to the imaginary superiority of the freehold over a chattel interest." *In re Hubbell Trust,* 135 Iowa, 637, 665, 113 N. W. 512, citing *Att'y Gen. v. Owen,* 10 Ves. 555, 559; *Att'y Gen. v. Griffith,* 13 Ves. 565.

The lease in question gives to the lessee an equitable interest in the property leased, which must on default be barred and foreclosed by a proceeding similar to the statutory action to foreclose a mortgage. Sec. 2197*a,* Stats.

Under the will the remaindermen were entitled to the fee. Instead they are getting the fee incumbered by a lease which will still be in force when they, and in all probability their children, are dead. These owners are barred from dominion or control over or use of the property. If they desire to sell they cannot break the property up into smaller parcels, but must sell the ground covered by each lease as an entirety. If they do sell they get, not what the property is intrinsically worth, but such sum as a purchaser would be willing to pay for an annuity equal to the amount of the rent.

So far the leases in question have been spoken of as ninety-nine year leases. It would be more correct in all probability to refer to them as perpetual leases. The one pertaining to the Plankinton House, for instance, provides that the term is to begin July 1, 1911; that for the first five years of the term the rent shall be $100,000 per annum; for the next five years $115,000, and for the next five years $125,000, and for each and every of the remaining eighty-four years, $128,262. The lease contains no revaluation provision. At the end of the ninety-nine year period the value of the buildings may be appraised, and the then owners of the property are en-

titled to have the lease terminated by paying the value of such buildings. No one can tell how numerous the owners will then be or how many of the parties in interest may be wholly unable to pay their share of the cost of the buildings. If they are unable to do this, the lease automatically continues for a period of ninety-nine years more for a rental of $130,000 per year. The same right exists to pay to the lessees the value of the buildings at the end of the second ninety-nine year period, and so on *ad infinitum.* If the owners are unable to pay at the expiration of any period, the lease continues for another ninety-nine year stretch. The same general provisions are found in the leases of the other two parcels of real estate. No one is presently wise enough to say that the leasehold interest will ever terminate. No one is wise enough to say whether the rental is adequate or inadequate. *William Woods Plankinton,* testifying in the case, said in substance that at the time the lease was negotiated he thought it was a good deal for the estate, but that owing to the rapid increase in value of Grand avenue property during the two or three years that had elapsed since the negotiations were entered into, he was inclined to doubt the wisdom of the arrangement.

Perhaps the provision for automatic renewals of the lease is not material, because if the trustees had the power to lease for a period of ninety-nine years, I see no reason why they could not lease for 999 years. The objections to the shorter period are as cogent as those to the longer one.

There is not a particle of evidence in the case showing or tending to show that leases for ninety-nine years are usual or customary in the city of Milwaukee or in the state of Wisconsin. It was not claimed on the oral argument that at the time John Plankinton made his will there was a single ninety-nine year lease in existence in the state. It is a matter of common knowledge that business property, even in the city of Milwaukee, is not customarily leased for any such

length of time.   There is no testimony on the point one way or the other, but the writer hazards a guess that in the entire state of Wisconsin a dozen such leases cannot be found.

The attorneys for the lessee did not endeavor to sustain the judgment on the ground that the court affirms it.   They say that "no question of authority of the trustees to make a lease beyond the term of the trust is involved."   Their main proposition in support of the judgment was that *Elizabeth Plankinton* and *William Woods Plankinton,* being of full age, had a perfect right to make any disposition which they saw fit of their interest in the estate, and that the court, having power to appoint a guardian for the minors, could direct such guardian to execute the lease, and that, the minors being of the same class as unborn heirs who might become interested in the estate, the action taken by the guardian would be binding on all minor and unborn heirs.   Stated more briefly, it was said that all persons having a present interest vested or contingent, as well as persons unborn who might acquire an interest in the future, were before the court and therefore bound by the judgment.   The case of *Gomez v. Gomez,* 147 N. Y. 195, 41 N. E. 420, was relied on to sustain this contention.   If the making of the leases was contrary to the will of the testator, this contention is entirely out of harmony with the cases of *Ruggles v. Tyson,* 104 Wis. 500, 81 N. W. 367, and *Will of Rice,* 150 Wis. 401, 136 N. W. 956, 137 N. W. 778.   The leases are out of harmony with the will of the testator, unless it was and is the law that an implied power to lease at all carries the power to make what is practically a lease in perpetuity.

The principal contention made by the attorneys for the executors was that the court should approve of the lease on the ground of overruling necessity in order to preserve the estate.   It was particularly urged that such doctrine was applicable to the Plankinton House property.   The parcels of real estate covered by the leases, however, had been yielding

a net revenue of about $100,000 a year for the past six years; so it is not apparent how the doctrine of "overruling necessity" could apply without stretching it to the breaking point, and the court holds that it does not apply.

While the eminent counsel who appeared for the respondents did not concede that the trustees did not have power to make a ninety-nine year lease, they devoted little attention to the point, and at least one of them admitted on the oral argument that the weight of authority was to the contrary.

I summarize the conclusions reached as follows:

1. The implied power to lease given by the Plankinton will was no broader than if express power to do so had been thereby conferred without specifying the length of time that leases should run.

2. When power to lease is conferred by either of the above methods, the law forbids the execution of a valid lease that extends materially beyond the trust period.

3. If the most liberal rule laid down by any of the authorities be followed, the power to lease conferred was limited to a reasonable, usual, and customary period.

4. Considered in connection with the provisions of the will, the leases under consideration are not reasonable and are not made for usual or customary periods.

5. The testator intended to tie up his estate during the lives of his children. He plainly provided that after their deaths the fee should go to the grandchildren. He might have tied up the estate for a much longer period without violating the statute against perpetuities.

6. Turning over to the grandchildren this property, incumbered by a lease which may well remain in force for all time, and which prevents use, occupation, sale in parcels, or sale in entirety on the basis of the actual value of the property, is not the equivalent of the estate in fee devised by the testator, and the intention of the testator is violated by making such leases.

7. Under the doctrine of *Ruggles v. Tyson* and *Will of Rice,* heretofore cited, the trustees and all parties in interest, where there are minors involved, could not change the will of the testator or make a disposition of the property different from that made by the will.

8. The facts did not present a case of overruling necessity which would justify a departure from the terms of the will in order to save the trust property from destruction.

9. It is idle to speculate on what Mr. Plankinton would have done had he been on earth in 1911. When he made his will he was as well qualified to peer into the future as the trustees and the court are now. It may well be doubted whether if he were alive he would approve of the lease, and it is immaterial whether he would or not. We are concerned with what he did, not with what he might have done had he lived longer.

10. The leases in question are violative of the scheme of the testator for the disposition of his property. First, because he was presumed to know the law and to have made his will with reference thereto, and therefore to have known that the implied power to lease given to the trustees did not confer power to make what in effect are leases in perpetuity; and, second, because the testator provided in his will that the owners of the vested remainders should take the title in fee in the full and unrestricted sense of that term. In practical effect they will receive an annuity instead.

Vinje, J. I concur in the foregoing dissenting opinion of Mr. Justice Barnes.